Francis Joseph SHEERAN, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Supreme Court of Delaware.

Submitted: Feb. 24, 1987.
Decided: May 27, 1987.

Charles Brandt, Wilmington, for appellant.

Richard E. Fairbanks, Jr. (argued), Chief of Appeals Div., and Loren C. Meyers, Deputy Atty. Gen., Wilmington, for appellee.

Before HORSEY, MOORE and HOLLAND, JJ.

HOLLAND, Justice.

In April, 1982, the defendant, Francis Joseph Sheeran, was convicted of two counts of Second Degree Criminal Solicitation following a jury trial in the Superior Court, in and for New Castle County. Various post-trial motions by Sheeran were denied. In January, 1984, Sheeran was sentenced to be imprisoned for a period of seven years on each count. Sheeran's direct appeal from these convictions was dismissed on jurisdictional grounds. Following the dismissal of the direct appeal, Sheeran's attorney moved for post-conviction relief in the Superior Court. The request for post-conviction relief was denied and an appeal was again dismissed on jurisdictional grounds.

Sheeran filed another motion for post-conviction relief in the Superior Court. The basis of the second motion was a claim of ineffective assistance of counsel in failing to perfect Sheeran's direct appeal and/or an appeal from the initial denial of Sheeran's request for post-conviction relief. The State acknowledged the merit of Sheeran's claim of ineffective assistance of counsel. On April 30, 1986, the Superior Court approved a stipulation which vacated Sheeran's 1984 sentence and reimposed the same sentence. Sheeran filed a timely appeal from the 1986 order reimposing the sentence. On appeal, we are now requested to review the 1982 convictions.

## FACTS

From October 1978 to February 1979 Charles Allen worked for the defendant, Sheeran. Sheeran was the union president of Teamster Local 326 in Wilmington, Delaware and hired Allen, ostensibly, as a union organizer. In reality, both men understood that Allen was being hired by Sheeran to do "anything that Frank Sheeran would ask me to do, such as burning down buildings, beating up people, anything he would ask." Unknown to Sheeran, Allen was an FBI informant and was wired with a body recorder. Transcriptions of secretly recorded conversations[1] between Sheeran and Allen form the basis of the charges against Sheeran which resulted in the 1982 convictions.

Count I deals with a plan to blow up a building of HIAB Cranes and Loaders Co., Inc. located in Newark, Delaware (HIAB). The first conversation on that subject took place on November 10, 1978 in Essington, Pennsylvania. Four more tape recorded

discussions between Allen and Sheeran relating to the destruction of the HIAB building were introduced into evidence. The second conversation in the plan to blow up HIAB took place in Wilmington, Delaware on November 17, 1978.[2] The third occurred in Wilmington, Delaware on November 19, 1978. The fourth occurred in Wilkes-Barre, Pennsylvania on November 22, 1978 and the final conversation occurred on December 1, 1978 in Wilkes-Barre, Pennsylvania. November 19, 1978 is the date set forth in Count I of the indictment as the date of the occurrence of the alleged criminal solicitation in Delaware to blow up the HIAB building.

Count II deals with the plan to assault an HIAB official, Donald Emenheiser, at his home in Maryland. Three tape recorded conversations were introduced with respect to the assault of Emenheiser. The first conversation took place in Essington, Pennsylvania on November 28, 1978. Allen testified that the assault was discussed on this date and that Allen was instructed to accompany a Sheeran associate, Joseph Schafferman, from Pennsylvania to Maryland to locate Emenheiser's home.[3] The second conversation concerning the assault of Emenheiser occurred in Wilmington, Delaware on November 29, 1978. This second conversation forms the basis of Count II that Sheeran solicited Allen in Delaware to assault Emenheiser in Maryland. The third and final conversation concerning the assault of Emenheiser occurred on December 6, 1978, in Philadelphia, Pennsylvania. In that final conversation, Allen misled Sheeran into believing that he had accomplished the assault on Emenheiser.

---

1. During the course of their association, Sheeran and Allen often conversed in code consisting of innuendo, half-finished sentences and seemingly innocent references to innocuous acts that both men understood to mean criminal conduct. The actual tape recorded conversations were played for the jury. Allen explained on direct and cross-examination what the coded language in these conversations meant.

2. On November 17, 1978, Sheeran's confederate Frankie Lord met Allen in Delaware at the union hall to arrange to drive Allen to HIAB so that Allen would know where exactly it was

located in Delaware. The trip itself was accomplished on the 19th when Allen and Lord drove to HIAB, looked it over and discussed the best way to do the bombing. Mr. Lord was charged in Delaware with conspiring with Allen and Sheeran to blow up HIAB and pled guilty to Conspiracy in the Second Degree.

3. Mr. Schafferman was charged in Delaware with conspiring with Allen to assault Emenheiser and convicted of Conspiracy in the Second Degree in a separate trial.

Following the presentation of the State's evidence, Sheeran moved for a judgment of acquittal on the ground that the criminal solicitations in this case were completed in Pennsylvania. The motion was denied. However, the jurisdictional issue was submitted to the jury. In fact, during its deliberations, the jury requested a clarification of the law on jurisdiction. In response to that request, the trial judge re-read the entire charge to the jury. The trial judge did not explain or amplify any of the language in the charge that pertained to jurisdiction. A short time later, *sua sponte,* and over a defense objection, the judge brought the jury back into the courtroom and further instructed them that in order for Sheeran to be found guilty of solicitation, the State need not prove that the actual "arson or assault have taken place."[4] The same day, May 4, 1982, Sheeran was found guilty of both counts of criminal solicitation in the second degree.

On May 5, 1982, a juror wrote a letter to the trial judge. (Appendix). The juror indicated that she had wanted to hold out for a verdict of not guilty "because of the jurisdiction" or alternatively "go for a hung jury". However, she alleged that when she tried to send the judge a note to that effect "one of the men jurors stood in front of the door and wouldn't let" her send it. She concluded her letter with a representation that due to that pressure she "had to give in." Sheeran filed a mo-

tion to have all jurors examined based upon the May 5 letter. Sheeran's post-trial request to examine the jurors regarding the alleged intimidation, was denied.

## THE CONTENTIONS

On appeal, Sheeran raises several claims in support of the contention that his convictions should be reversed: (1) That the crimes of solicitation were made, accepted and completed in Pennsylvania. Therefore, Sheeran argues that Delaware was without jurisdiction to try him for either solicitation. (2) That the prosecutions for solicitation were barred by 11 *Del.C.* § 209 because Sheeran had been tried in federal court and acquitted of RICO's charges premised upon the same conduct.[5] (3) That the Superior Court erred in failing to hold an evidentiary hearing to determine whether one of the jurors had been exposed to improper influence during the jury deliberations. (4) That the Superior Court erred in giving the jury a supplemental instruction, *sua sponte* and over the objection of Sheeran's attorney.

We conclude that there is no basis in the record for reversing either of Sheeran's convictions.

## SOLICITATION/JURISDICTION

Sheeran was convicted of two counts of criminal solicitation in the second degree.[6]

---

**4.** There had been extensive uncontradicted testimony by Allen and the intended victim of the assault, Donald Emenheiser, that the crimes were staged, that Allen was working for the FBI all along and never intended to commit the crimes and that Allen lied to Sheeran when he reported back that "he'd done them."

**5.** In 1979, Sheeran was indicted in the United States District Court for the Eastern District of Pennsylvania on a charge of conspiracy to participate in an enterprise affecting interstate commerce through a pattern of racketeering activity (hereinafter RICO). Two of the allegations of that federal RICO conspiracy charge alleged that Sheeran conspired with Allen to blow up HIAB and that Sheeran conspired with Allen to assault Emenheiser. Sheeran was acquitted before a jury in that federal prosecution.

**6.** The charges read as follows:
COUNT I. A Felony # N–81–03–0980

CRIMINAL SOLICITATION, in the Second Degree, in violation of Title 11, Section 502 of the Delaware Code of 1974 as amended.

FRANCIS JOSEPH SHEERAN, on or about November 19, 1978, in the County of New Castle, State of Delaware, when intending to facilitate the Felony of Arson Second Degree, did request Charles Allen to engage in conduct constituting said Felony by intentionally damaging a building of HIAB Cranes and Loaders, Inc., by causing an explosion there.

COUNT II. A Felony # N–81–03–0981
CRIMINAL SOLICITATION, in the Second Degree, in violation of Title 11, Section 502 of the Delaware Code of 1974, as amended.

FRANCIS JOSEPH SHEERAN, on or about November 29, 1978, in the County of New Castle, State of Delaware, when intending that Charles Allen engage in conduct constituting the Felony of Assault Second Degree, did request Charles Allen to engage in conduct constituting said Felony by intentionally striking Donald S.

Evidence presented at the trial included testimony and tape recordings of prior conversations. The subject matter of Count I was first discussed in a conversation between Sheeran and Allen on November 10, 1978 at a motel in Pennsylvania. Two other conversations between Sheeran and Allen involving that same subject matter were held on November 17, 1978 and November 19, 1978 in Delaware. The subject matter of Count II was first discussed between Sheeran and Allen on November 28, 1978 in Pennsylvania. Another conversation between the same two men involving the same subject was held in Delaware on November 29, 1978.

Although both Sheeran and the State agree that the initial conversation with respect to each Count took place in Pennsylvania, they disagree about whether the crimes were *completed* with these "initial" conversations. Sheeran contends that with respect to each Count, the evidence shows that the solicitation occurred in Pennsylvania, during the original conversation. Sheeran argues that since the subsequent conversations in Delaware were merely an implementation or planning of the prior requests in each Count, they did not constitute a solicitation in Delaware. Consequently, Sheeran argues that, there was no criminal solicitation in Delaware and *a fortiori* that Delaware had no territorial jurisdiction to prosecute him. We will examine that issue first.

■ The burden is upon the State to prove territorial jurisdiction as an element of any criminal offense. 11 *Del.C.* § 232. *See Bright v. State*, Del.Supr., 490 A.2d 564, 566 (1985); *Carter v. State*, Del.Supr., 418 A.2d 989 (1980); *Thornton v. State*, Del.Supr., 405 A.2d 126 (1979); *James v. State*, Del.Supr., 377 A.2d 15 (1977); *Saienni v. State*, Del.Supr., 346 A.2d 152 (1975). To satisfy this burden, the State must establish that a legal situs of the offense was in Delaware. In fact, at Sheeran's trial, the jury was specifically instructed that the State must establish

jurisdiction as an element of each count of criminal solicitation.

Sheeran's jurisdictional challenge, in essence, is an assertion that there was insufficient evidence to support the verdict as to that jurisdictional element of each Count. When a defendant challenges his conviction claiming that there was insufficient evidence to support the verdict, this Court determines whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. In conducting its review, this Court views the evidence in the light most favorable to the prosecution. *Davis v. State*, Del.Supr., 453 A.2d 802, 803 (1982).

The common law territorial theory of criminal jurisdiction has been enlarged in Delaware by statute. The intent of the legislature was "to expand Delaware's criminal jurisdiction as widely as it constitutionally may be extended." *Bright v. State*, 490 A.2d at 567 (quoting *Delaware Criminal Code with Commentary*, § 204 at 10 (1973)). Territorial jurisdiction in criminal cases is currently established by the Delaware Code which in pertinent part provides:

(a) Except as otherwise provided in this section, a person may be convicted under the law of Delaware of an offense committed by his own conduct or by the conduct of another for which he is legally accountable if:

(1) Either the conduct or the result of which is an element of the offense occurs within Delaware; or

\* \* \* \* \* \*

(3) Conduct occurring within the State establishes complicity in the commission of, or an attempt, solicitation, or conspiracy to commit, an offense in another jurisdiction which also is an offense under the law of Delaware;

\* \* \* \* \* \*

11 *Del.C.* § 204. Our examination of the record leads us to conclude from the evidence that these offenses occurred within the legal territorial jurisdiction of Dela-

---

Emenheiser, an official of HIAB Cranes and Loaders, Inc., with a dangerous instrument, a

bat, thereby causing Donald S. Emenheiser to suffer physical injury.

ware is more than sufficient to sustain the verdict as to Count I under 11 *Del.C.* § 204(a)(1) and the verdict as to Count II under § 204(a)(3).

## COUNT I

Count I of the indictment charges that Sheeran solicited Allen to commit arson in the second degree against HIAB. The initial conversation relative to Count I occurred in Pennsylvania on November 10, 1978. Sheeran and Allen subsequently met in Wilmington, Delaware on November 17, 1978. That latter conversation resulted in the scheduling of a further meeting on November 19, 1978.

■ Criminal solicitation in the second degree, is defined in 11 *Del.C.* § 502. It provides:

A person is guilty of criminal solicitation in the second degree when, intending that another person engage in conduct constituting a felony, he solicits, requests, commands, importunes or otherwise attempts to cause the other person to engage in conduct which would constitute the felony or an attempt to commit the felony, or which would establish the other's complicity in its commission or attempted commission.

*Id.*

The crime of solicitation is complete only when the request or command to do the act constituting the felony is made. 61 *Columbia Law Review*, 625–627; 4 *Wharton's Criminal Law* § 713, p. 512–3. It does not require assent or agreement by the person solicited. *Id.* Nor does it require that the other party take any action pursuant to the solicitation. *Id.* It is the momentary act of request or command and requires no subsequent act by the solicitor or by the person to whom the request was made. *State v. Donovan*, 28 Del. 40, 90 A. 220 (1914); *Id.*

■ However, the crime of solicitation under the *Delaware Criminal Code* does require that the request or command contemplate *specific conduct.* As the Code Commentary makes clear:

The statute requires that specific conduct constituting a crime must be encouraged; the point is to preserve the right of free speech and to exculpate legitimate agitators suggesting, for example, a strike which might conceivably result at some future time in some illegality. *Delaware Criminal Code,* § 501 commentary at 137–38 (1973). The need for specificity is crucial to protect the Constitutional guarantee of free speech. Unless the advocacy of a violation of law is directed at inciting or producing imminent lawless action and is likely to incite or produce such action, the State cannot criminalize such advocacy. *See Hess v. Indiana,* 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973); *Brandenberg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). Indeed, even the authorities upon which Sheeran places reliance recognize that the "request must be sufficiently clear so that the solicitee must be able to know what he is asked to do" and that the objective is a criminal offense. *Frye v. State,* 62 Md.App. 310, 489 A.2d 71, 74 (1985). Cf. *Delaware Criminal Code,* § 501 commentary (1973). In examining a series of contacts, the Court must draw the line between speech which is protected and speech which is prohibited at the point where specific criminal activity is importuned. Therefore, a request which fails to contemplate specific conduct is not a criminal solicitation under the Delaware Criminal Code.

■ The November 19, 1978 conversation in Wilmington, Delaware is the basis of Count I. It dealt with the specifics of the crime for which Allen was solicited for the first time. The November 19, 1978 conversation discussed the procurement and transportation of dynamite, the manner in which it was to be used, against whom it was to be used, and Allen's compensation for "doing the job." A second conversation on the same day (November 19, 1978) in Wilmington, Delaware also arranged a trip for Allen to examine the exact location in Delaware where the dynamite was to be used.

Admittedly, Sheeran and Allen had a long-standing criminal relationship and in

the past, Sheeran had hired Allen to commit various crimes to further Sheeran's union activities.[7] However, in the initial Pennsylvania conversation on November 10, 1978, Sheeran simply told Allen that "I'm going to have something for you down in Delaware on this ah, on this company HIAB down there." Sheeran relies on Allen's answers to leading questions during cross-examination to the effect that the agreement to blow up HIAB occurred in Pennsylvania. However, the jury was not bound by Allen's conclusory remarks. Sheeran's challenge to his conviction under Count I fails because he ignores the lack of specificity in the initial Pennsylvania conversation on November 10, 1978. The specifics of the offense solicited in Count I (arson) were not discussed in the initial Pennsylvania conversation. Even Allen's acceptance of a general proposal in the Pennsylvania conversation would not complete the crime. Absent sufficient specificity for Allen to know what crime was to be committed, there is no solicitation.

The jury was the sole judge of credibility and responsible for resolving conflicts in the evidence. *Tyre v. State*, Del.Supr., 412 A.2d 326, 330 (1980). The actual tape recorded conversations support the jury's finding that the offense charged in Count I occurred within the territorial jurisdiction of Delaware on November 19, 1978. Since the evidence shows that the solicitation and the intended result charged in Count I of the indictment occurred in Delaware, the State established the jurisdictional requirements of 11 *Del C.* § 204(a)(1).

## COUNT II

A different analysis applies with regard to Count II, which alleges that Sheeran solicited Allen to commit the crime of assault second degree on Emenheiser. The initial conversation about this offense which occurred in Pennsylvania on November 28, 1978 did include references to specific conduct, i.e., an assault with a baseball bat. In fact, as Sheeran argues, reference to the preceding Pennsylvania conversation is necessary to give meaning to the subsequent Delaware conversation.[8] Sheeran's contention is that there can only be one request or solicitation to carry out any particular felonious conduct.

■ However, the fact that a criminal solicitation can be accomplished with one contact does not preclude *several contacts*. The very case upon which Sheeran relies acknowledges that a *single solicitation may continue* over a *period of time and involve several contacts*. *Frye v. State*, Md.App., 489 A.2d at 74. Conceding that a single solicitation may be of a continuing nature, Sheeran's position is that the Delaware conversation, which forms the basis for Count II was merely in furtherance of the original solicitation, which was made in Pennsylvania. Therefore, Sheeran argues that he has no criminal liability in Delaware for those subsequent conversations.

■ Where the object of the solicitation is discussed in two or more conversations, a court must always determine when the solicitation first occurred, as we did in our analysis with respect to Count I. In fact, our examination under Count I led us to conclude that the first solicitation did not occur in Pennsylvania. In examining Count II, we assume *arguendo* that there was a specific solicitation during the initial conversation in Pennsylvania on November 28, 1978. However, the solicitation was not completed in Pennsylvania but continued with a subsequent conversation in Delaware. Sheeran's argument that the subsequent November 29 conversation in Delaware was *"only"* the detailed planning of the offense already solicited in Pennsylvania is an admission, not an absolution, of criminal complicity within Delaware's territorial jurisdiction.

■ By enacting § 204(a)(3), we find that Delaware intended to extend its crimi-

---

7. Allen admitted that he committed arson at a north Philadelphia union hall at Sheeran's direction in 1976.

8. The fact that criminal activity in one state, involving the same crime, can be used against a defendant in Delaware has previously been recognized by this Court. *Saienni v. State*, Del. Supr., 346 A.2d 152 (1975).

nal jurisdiction to encompass a single solicitation that continues over a period of time and involves several contacts, not all of which are in Delaware.[9] The subsequent "detailed planning" distinction of the prior solicitation, which Sheeran admits occurred in Delaware, has been rejected by the Delaware legislature. This is the type of complicity which Delaware seeks to punish, whether the subsequent conversation constituted a new and independent solicitation or the detailed planning of the offense already solicited. 11 *Del.C.* § 204(a)(3).[10]

The Delaware statute is based upon § 1.03(3)(d) of the Model Penal Code of the American Law Institute. The model statute was expressly designed to affirm jurisdiction over crimes committed "partly" within a state. The commentary to the Model Penal Code notes that the Model Code's treatment of complicity is such that conduct within the state sufficient to establish the actor's complicity in the completed crime serves to "justify prosecution for the completed crime." Model Penal Code, § 1.03(1)(d) commentary at 35–66 (1985).

█ The November 29, 1978 conversation in Delaware constitutes the contemplated crime of solicitation because the evidence shows the following with respect to the charges set forth in Count II: Sheeran's actions within Delaware demonstrated complicity (detailed planning) in a solicitation (started in Pennsylvania) to commit an offense (assault on Emenheiser) in another jurisdiction (Maryland) which is also an offense in Delaware. The State, therefore, established the jurisdictional requirements of 11 *Del.C.* § 204(a)(3). Since the detailed planning of Sheeran's solicitation to assault Emenheiser continued within the territorial jurisdiction of Delaware, the jury's verdict on Count II is supported by the evidence and hence must be affirmed.

## SUPPLEMENTAL JURY INSTRUCTIONS

Sheeran's next challenge relates to the trial Court's supplemental charge to the jury. During its deliberations, the jury asked the trial judge for a clarification of the instruction on jurisdiction. The trial judge responded to that request by reading the original charge to the jury again, in its entirety, with the consent of the defense and prosecution. About twenty minutes later, apparently realizing that a portion of the charge might be misleading, the judge *sua sponte* recalled the jury. At that point, the judge instructed the jury, that for Sheeran to be guilty of criminal solicitation, all of the elements must be established beyond a reasonable doubt,

> and this includes a finding that the defendant must have had the intent to cause the felony of Arson Second Degree (Count I of the indictment) or Assault Second Degree (Count II). It is not necessary, however, that the arson or assault have taken place.

At trial, Sheeran's attorney objected to the supplemental instruction being given, but did not challenge the actual content of the instruction. On appeal, Sheeran argues that he was denied due process because the supplemental instruction unfairly emphasized a particular aspect of the prosecution's case.

█ A trial judge acts in his discretion when deciding to give the jury a supplemental instruction.[11] His authority to

---

**9.** A similar result was reached in Montana. *State v. Bush,* 195 Mont. 475, 636 P.2d 849 (1981) *(evidence of events occurring outside of Montana were relevant to show that the purpose of the Montana conversation was a solicitation to facilitate the commission of a crime in another jurisdiction). Accord Saienni v. State,* Del. Supr., 346 A.2d 152 (1975).

**10.** The commentary to the Model Penal Code notes that although 27 jurisdictions have had enacted or proposed statutes with provisions analogous to subsection (1)(d), four of those provisions omitted "solicitation", one omitted

both "solicitation" and "conspiracy". The commentary also notes that seven of the enacted statutes do not include the words "complicity in the commission of" an offense or comparable language. The Delaware statute includes the language of the Model Penal Code verbatim. Delaware's inclusion of solicitation *and* complicity language is a clear indication of legislative intent.

**11.** *See State v. Pignolet,* R.I.Supr., 465 A.2d 176, 184 (1983). For example, when a judge realizes that he has incorrectly charged the jury, he can withdraw the erroneous instruction and give the

do so is not dependent upon a request by the jury. In this case, the trial judge exercised that discretion. The phrasing used in the original charge suggested that the substantive crimes allegedly solicited had to have been committed for Sheeran to be convicted as charged. That implication, however, would be wrong. The person solicited need not actually commit the act for the solicitor to be liable for the criminal request. *Delaware Criminal Code*, § 501 commentary at 137, 149–50 (1973). *Accord* Model Penal Code § 5.02, comment 3 at 370 (1985). *See* 11 *Del.C.* § 523(a). The supplemental charge did no more than correctly clarify the original instruction. A defendant is entitled to a correct statement of the substantive law. *Miller v. State*, Del. Supr., 224 A.2d 592 (1966). That is what Sheeran received in this case. A defendant has no right to an erroneous or unclear instruction even if it was given twice before in the same case. *See Bailey v. State*, Del.Supr., 521 A.2d 1069, 1093–1094 (1987).

■■■ The trial court's instructions to the jury will not serve as grounds for reversible error if they are "reasonably informative and not misleading, judged by common practices and standards of verbal communication." *Baker v. Reid*, Del. Supr., 57 A.2d 103, 109 (1947). In evaluating the propriety of a jury charge, the entire instruction must be considered with no statement to be viewed in a vacuum. *Id.* at 109. *See also Haas v. United Technologies Corp.*, Del.Supr., 450 A.2d 1173, 1179 (1982). The supplemental charge to the jury cannot be viewed in a vacuum either. In this case the supplemental charge was given within twenty minutes of the second reading of the original charge in its entirety. We find that the supplemental charge was reasonably informative and not misleading, judged by common practices and standards of verbal communication. We find no error in the Court's supplemen-

tal charge to the jury under the facts presented in this case.

## IMPROPER INFLUENCE OF JUROR

The next issue which we address is Sheeran's contention that his convictions should be set aside because of improper influence upon one of the jurors. The basis of this assertion is a letter written to the trial judge by a juror. (Appendix). The juror alleged that she had been pressured into making her decision and that she had been prevented from sending a note to the trial judge. Subsequently, two other jurors wrote to the Court denying that anyone had been coerced, threatened, or pressured.

Sheeran filed a post-trial motion requesting that the jury be recalled and examined to ascertain the validity of the allegations. The trial judge concluded that relief was unavailable for two reasons. First, he ruled that the letter did not fall within the terms of admissibility set out in Delaware Rule of Evidence 606(b). Second, he ruled that the juror's failure to object to the verdict during the poll of the jury was a more persuasive indication of the absence of pressure than the post-verdict letter to the contrary.

■■■ As a general rule, a juror may not impeach his own verdict once the jury has been discharged.[12] *McDonald v. Pless*, 238 U.S. 264, 267, 35 S.Ct. 783, 784, 59 L.Ed. 1300 (1915). This rule promotes several public policies: 1) discouraging harrassment of jurors by losing parties eager to have the verdict set aside; 2) encouraging free and open discussion among jurors; 3) reducing incentives for jury tampering; 4) promoting verdict finality; and 5) maintaining the viability of the jury as a judicial decision-making body. *Id.*

However, our criminal justice system is premised upon the theory that the conclu-

correct instruction. *See Murray v. District of Columbia*, D.C.App., 358 A.2d 651, 653 (1976). *Cf. Poli v. State*, Del.Supr., 418 A.2d 985, 987 (1980) (remedial instruction can correct prior error in instruction); *State v. Liberty*, Me.Supr., 478 A.2d 1112, 1116–17 (1984) (same); *State v. Inman*, Me.Supr., 350 A.2d 582, 588–89 (1976)

(same); *Commonwealth v. Lopez*, 455 Pa. 353, 318 A.2d 334, 337 (1974) (same).

**12.** This rule was originally formulated over two hundred years ago in *Vaise v. Deloval*, 99 Eng. Rep. 944 (1785).

sions which the jury reaches "in a case will be induced only by evidence and argument in open court and not by any outside influence." *Patterson v. Colorado*, 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907). It has been recognized, therefore, that a flat prohibition against receiving post-verdict testimony from jurors would contravene another important public policy: that of "redressing the injury of the private litigant where a verdict was reached by a jury that was not impartial." *Id.* Extrinsic influences upon a jury may violate various protections guaranteed by the Sixth Amendment of the United States Constitution—a defendant's right to confront witnesses, his right to assistance of counsel, and his right to an *impartial* jury.

In an effort to accommodate the conflicting policies of preserving the sanctity of a jury's deliberations and the defendant's right to be convicted only by evidence and argument in open court, courts have distinguished between extrinsic and intrinsic influences upon a jury's verdict. Since the 19th Century, the established rule regarding a juror's competence to attack a verdict is that "a juryman may testify to any facts bearing upon the question of the existence of any extraneous influence, although not as to how far that influence operated upon his mind." *Mattox v. U.S.*, 146 U.S. 140, 149, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892). This standard has been codified by the Federal Rules of Evidence and the Delaware Rules of Evidence. (F.R.E. and D.R.E. 606.) [13]

 *Extraneous* influence has been construed to cover 1) exposure of jurors to news items about the matters pending before the jury, 2) consideration by the jury of extra record facts about the case, 3) communications between third parties and jurors relevant to the case to be decided and 4) pressures or partiality on the part of the court. *Government of Virgin Islands v. Gereau*, 523 F.2d 140, 150 (3d Cir.1975), *cert. den. Gereau v. Government of Virgin Islands*, 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976). *Intrinsic* influences have been construed to include "discussions among jurors, intimidation or harrassment of one juror by another, and other intra-jury influences on the verdict." *Id.* at 150.[14] Jurors are competent to testify about extrinsic influences but not about intrinsic influences on the verdict.

 In support of his argument that his conviction should be reversed because a juror was improperly influenced, Sheeran cites this Court's decision in *McCloskey v. State*, Del.Supr., 457 A.2d 332 (1983).[15] However, our holding in *McCloskey* is a graphic acknowledgment of the distinction between intrinsic and extrinsic influences upon a juror during the course of deliberations. The facts in *McCloskey* show that late in the evening of the first day of jury deliberations, the Jury Forelady requested an *in camera* conference with the trial judge. The trial court, with counsel, met with the Forelady. She informed the Court that Juror No. 4 was non-communicative,

---

**13.** Rule 606(b), COMPETENCY OF JUROR AS WITNESS. *Inquiry into Validity of Verdict or Indictment.* Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

**14.** It should be noted that extrinsic evidence or opinions that enter the jury room through the lips of another juror are still considered extrinsic influences, and the jury's receipt of such evidence is a ground to overturn the verdict and the speaker is competent to testify to such matters. *Government of Virgin Islands v. Gereau*, 523 F.2d 140 (1975), *cert. den. Gereau v. Government of Virgin Islands*, 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976); *Hughes v. State*, Del.Supr. 490 A.2d 1034 (1985).

**15.** If only one juror is *improperly* influenced, a defendant in a criminal case is denied his Sixth Amendment right to an impartial jury. *Styler v. State*, Del.Supr., 417 A.2d 948, 951–52 (1980). (emphasis added).

refused to join in deliberations, and felt that the other jurors were antagonistic toward her. The Forelady also informed the Court that Juror No. 4 desired an interview with the Court. The trial judge, with counsel, the Prothonotary and a court reporter, met with Juror No. 4 the following day.[16]

The *McCloskey* trial court advised Juror No. 4 to formulate any legal questions she might have, submit those to the Forelady, and the trial judge would address those questions in open court before the entire jury. Thereafter, the Court called in the jury to request any further questions. No questions were presented and the jury returned to continue with its deliberations. The following morning, the trial judge received another note from the Forelady requesting a second interview. The Court and counsel met with the Forelady for a second time. McCloskey's counsel moved for a mistrial on the ground that the apparent animosity among the jurors coupled with the trial judge's involvement with the individual jurors could result in juror intimidation and the denial of a fair trial. The trial judge in McCloskey denied that defense motion but expressed concern about the *in camera* and *in court* interviews and the possible detrimental effect of those interviews.

We have reiterated the *McCloskey* facts in some detail because they clearly reveal that after the jury had begun its deliberations, the trial court, in the presence of counsel, met separately with two individual jurors, i.e. the Forelady and Juror No. 4. In reversing McCloskey's conviction, we found that the record established a reason-

able probability of the unlawful intimidation of Juror No. 4. However, the intimidation which we addressed in *McCloskey* was not the animosity within the jury room, but the confrontations between the trial court and the jurors.[17] The holding in *McCloskey* is a recognition that pressures on a juror from the Court are improper *extraneous* influences.[18]

In contrast to *McCloskey*, the juror's letter to the trial judge in this case describes the pressures that were felt by one juror from *other jurors* during the course of deliberations. The juror's letter alleges pressure by other jurors because of union affiliation. In addition, it alleges that the juror was prevented from sending a note to the trial judge. The pressure that the juror felt is inherent in the jury system. Those pressures and the juror's reaction to them are neither extraneous information nor outside influence. They are an inherent and *intrinsic* part of the deliberative process. (emphasis added). *See Lovett v. State*, Del.Supr., 516 A.2d 455, 475 (1986); *Burke v. State*, Del.Supr., 484 A.2d 490, 500–01 (1984).

During the course of jury deliberations there are numerous pressures which are brought to bear upon the jurors, particularly those who find themselves in a minority position. It is unthinkable that such pressures would not exist, and they undoubtedly multiply as the size of the minority diminishes.[19] One would expect that those in the majority would argue forcefully in an attempt to persuade those in the minority to accept the views of the majority.[20]

**16.** Juror No. 4 expressed surprised that so many persons were present.

**17.** We noted that the situations in *McCloskey* was one into which the trial judge was drawn inadvertently, despite his careful effort to clarify the juror's questions on the law.

**18.** Almost fifty years ago, Justice Stone noted that the course of effect of a judge's remarks "more often depend upon circumstances which cannot properly be known to the trial judge or to the appellate courts ..." Justice Stone stressed that some inquiries "can really be resorted to without bringing to bear in some degree, serious, although not measurable, an improper influence upon the jury, from whose

deliberations every consideration other than that of the evidence and the law as expounded in a proper charge should be excluded." *Brasfield v. United States*, 272 U.S. 448, 450, 47 S.Ct. 135, 136, 71 L.Ed. 345 (1926).

**19.** *United States v. Musto*, D.N.J. 540 F.Supp. 318, 344 (1982). *See also United States v. Kohne*, 358 F.Supp. 1046 (WD 1973), aff. without opinion *Appeal of Tabella*, 485 F.2d 681 (3d Cir.1973), *cert den. Kohne v. United States*, 417 U.S. 918, 94 S.Ct. 2624, 41 L.Ed.2d 224 (1974).

**20.** The interaction among jurors has often been the subject of literary fiction. We suspect there may be much fact to the fictional jury depicted in *Twelve Angry Men* by Reginald Rose.

However, it is generally held that jurors may not impeach their verdict by testimony that it resulted from coercion or majority vote. See Jones, *Evidence*, Volume III, § 20:58, page 727 (Sixth Edition); 8 Wigmore, *Evidence*, §§ 2345–2356 (1961).

The juror in this case does not suggest that anyone attempted or threatened to injure her.[21] The juror only states that she was not allowed to send a note to the judge. There is no explanation for the juror's subsequent failure to communicate with the court before the verdict was rendered or the juror's assent to the verdict when the jury was polled. In fact, that is the purpose of the poll. (Super.Ct.R.Crim. Pro. 31(d)).

■ A trial judge has a very broad discretion in deciding whether a case must be retried or the juror summoned and investigated due to alleged exposure to prejudicial information or improper *outside influence*. *Styler v. State*, Del.Supr., 417 A.2d 948 (1980). (emphasis added). However, inquiry into a juror's mental process is not permitted. D.R.E. 606(b), *Burke v. State*, Del.Supr., 484 A.2d 490 (1984). In this case, the effect of the alleged actions of other jurors upon the mind or emotions of the juror who wrote to the trial court, is precisely the kind of intra-jury influence that the prohibition in D.R.E. 606(b) was designed to protect from inquiry. It is not open to consideration. We find the trial judge did not abuse his discretion in refusing to hold an evidentiary hearing as to the allegations set forth in the juror's letter

or in refusing to grant a new trial. *Burke v. State*, Del.Supr. 484 A.2d 490, 501 (1984). See also *Lovett v. State*, Del.Supr., 516 A.2d 455 (1986).

## RICO ACQUITTAL AS BAR TO PROSECUTION

■ We now turn to Sheeran's final challenge to his convictions. In 1979, a federal grand jury in the Eastern District of Pennsylvania charged Sheeran and Louis J. Bottone with violating the Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. § 1962(c)) and conspiracy to violate RICO (18 U.S.C. § 1962(d)).[22] According to the grand jury, Sheeran and Bottone participated in an enterprise[23] affecting interstate commerce through a pattern of racketeering activity[24] in order to enhance and protect their position in the regional organized labor and organized crime hierarchies. To achieve those goals, they allegedly hired Allen to act as a bodyguard and to commit murder and arson at their direction. The pattern of racketeering activity alleged by the government consisted of nine "predicate crimes":[25] two murders, four attempted murders, one incident of arson, crossing state lines to promote or engage in racketeering enterprises, and embezzlement of labor union funds. As part of the conspiracy, Sheeran was alleged to have instructed Allen to cause an explosion at HIAB of Newark, Delaware and to assault an official of HIAB.

---

**21.** "We do not say that there can be no threat short of violence by one juror against a recalcitrant dissenter that will upset a verdict, but certainly there was nothing in the case at bar to justify such action." *United States v. Grieco*, 261 F.2d 414, 415 (2d Cir.1958), *cert. den. Grieco v. United States*, 359 U.S. 907, 79 S.Ct. 582, 3 L.Ed.2d 572 (1959).

**22.** Sheeran was also accused of aiding and abetting a violation of the Travel Act (18 U.S.C. § 2, 1952). The statute prohibits interstate travel or using interestate commerce to engage in or promote certain racketeering practices. *Id.*

**23.** An "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The enterprise can be

legitimate or illegitimate. *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981).

**24.** A "pattern of racketeering activity" consists of "at least two acts of racketeering activity, one of which occurred after [October 15, 1970] and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). "Racketeering activity" is defined as a violation of any of a variety of state and federal laws. 18 U.S.C. § 1961(1).

**25.** *United States v. Boffa*, D.Del., 513 F.Supp. 444, 482 (1980).

Sheeran was acquitted on all counts of the 1979 federal indictment. Nevertheless, he was indicted in 1981 by a Delaware grand jury on two counts of second degree criminal solicitation based on his instructions to Allen regarding HIAB. Sheeran's convictions of those charges are at issue in this appeal.

Sheeran filed a pre-trial motion to dismiss the Delaware charges, arguing that his federal acquittal barred, through the federal and state double jeopardy clauses, state law, and collateral estoppel, the state prosecution. In a carefully written (and now reported opinion), that motion was denied by the Superior Court. *State v. Sheeran*, Del.Super., 441 A.2d 235 (1981).

Sheeran's sole challenge, in this appeal, to that ruling is that the Superior Court erred in concluding that the federal and state prosecutions were not based on "the same conduct" and, therefore, prohibited by 11 *Del.C.* § 209(1). We find, upon the analysis set forth in the well-reasoned opinion of the trial court, that Sheeran's prosecution in Delaware was not barred by the provisions of 11 *Del.C.* § 209(1)(a).

### CONCLUSION

The convictions of Francis Joseph Sheeran are AFFIRMED.

### APPENDIX

The day after the verdict, a juror wrote the following unsolicited letter to the court:

May 5, 1982

Your, Honorable Judge Taylor

I am writing this letter to you in regards to the Frank Sheeran trial.

I was on that Jury and I would like to bring a few things to your attention.

First, of all I was the one holding out on a decision, the other jurors (some of them) felt I was to blame for us being kept over, I was pressured into making my decision, and now I find it hard to live with myself knowing I let other people do this to me. Everyone reached a guilty verdict right away. I was last, *on first* chg. On second charge, again I was last to reach my decision, and then I

was accused of being prejudice because my husband is a teamster and belongs to local 326. From the day I took my oath, this did not influence my decision one way or the other. I never made a secret that my husband belonged to that union. I belong to a union, so you see the hard time I'm having coping with myself. I never tried to change the other jurors decision and I don't think they had a right to try and make me change mine. I sent a note to you in the afternoon when it was brought to my attention about how some of the others felt and me being prejudice. I could not bring myself to believe this man was guilty because of the jurisdiction that was the only reason so help me God. I even ask that we go for a hung jury after I found out that they thought I was prejudice. I wrote you a note then but one of the men jurors stood in front of the door and wouldn't let me send it so you see I was under so much pressure I had to give in.

I'm not very good at works when I'm so upset, so thank you so much for taking time to read this.

(name omitted)

P.S. I had a doubt then so help me I still feel the man was not guilty."