IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| NATHANIEL GONZALEZ, | § | |
| | § | No.   336, 2016 |
| Defendant Below- | § | |
| Appellant, | § | Court Below:   Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | |
| STATE OF DELAWARE, | § | ID No. 1506000814 |
| | § | |
| Plaintiff Below- | § | |
| Appellee. | § | |

Submitted:   February 22, 2017
Decided:   March 31, 2017

Before **STRINE**, Chief Justice; **VALIHURA** and **VAUGHN**, Justices.

## ORDER

On this 31st day of March 2017, it appears to the Court that:

(1)   Appellant, Nathaniel Gonzalez, appeals from a Superior Court jury verdict finding him guilty of two counts of Assault First Degree, one count of Assault Second Degree, three counts of Possession of a Firearm During the Commission of a Felony ("PFDCF"), and three counts of Conspiracy Second Degree.   Gonzalez frames his appeal as making one claim, but it contains parts.   He contends that the trial court abused its discretion by providing the jury with a supplemental instruction on accomplice liability after the jury had begun deliberations, and he also contends that once a decision was made to give the instruction, the instruction should have included an instruction on individualized culpability under 11 *Del. C.* § 274.

Gonzalez contends that these errors deprived him of a meaningful opportunity to present a complete defense.

(2)     On May 31, 2015, the New Castle County Police were dispatched to Christiana Hospital to speak with victims of a shooting that had occurred at Lancaster Court Apartments.   Upon arrival at the hospital, Officer Jonathan Feliciano was able to speak to one of the victims, Gabriel Juarez, Jr. ("Juarez, Jr."). The other two victims of the shooting were already in the operating room at that time.   Officer Feliciano took Juarez, Jr. back to the Lancaster Court Apartments, the scene of the crime.   Upon their arrival at the apartment complex, the scene was taped off, and other officers had secured the area.   Juarez, Jr. confirmed that the scene was the location of the shooting and Officer Feliciano transported him back to the hospital.

(3)     Following the shooting, Nathanial Gonzalez ("Gonzalez") and his brother, Isaiah Gonzalez ("Isaiah"), were identified as suspects.   While at the scene of the shooting, the police discovered what appeared to be a bloody shoeprint that crossed the threshold of the door to apartment A.   Based on that information, the New Castle police obtained and executed a search warrant on apartment A.   During the search of the apartment, the police recovered a blood-stained hat, a long gun case for either a rifle or a shotgun, and ammunition for .20 gauge and .12 gauge shotguns.

The detectives also found evidence that Gonzalez and Isaiah were occupants of the apartment.

(4)    During the investigation, the three victims were each shown two photo line-ups, one containing a photo of Gonzalez and one containing a photo of Isaiah. One of the victims was able to make identifications of Gonzalez and Isaiah. Following the identifications via the photo line-ups, arrest warrants were issued for Gonzalez and Isaiah.   Three days after the shooting, both were taken into custody. After Gonzalez was arrested, he was interviewed by the New Castle County Police. His taped interview was played during the trial.

(5)    Prior to Gonzalez's trial, Isaiah resolved the charges against him by pleading guilty to Conspiracy and PFDCF.   During Gonzalez's trial, Isaiah testified on behalf of the defense.   He stated that on May 31, 2015, he and Gonzalez went to a family barbeque.   Isaiah stated that he and his brother separated and Isaiah returned to his apartment.   Gonzalez returned to the apartment later and seemed scared.    Isaiah heard a commotion outside the apartment, and when he opened the door, he saw about five men approaching in the vestibule, shouting and "throwing up gang signs."[1]   One pointed at a gang tattoo.   The men did not have any weapons. Isaiah, however, loaded a shotgun.   He said the men were trying to come into the

---

[1]  App. to Appellant's Opening Br. at 100.

apartment and were attacking the two of them. Isaiah pointed the .12 gauge, double-barrel shot gun, which he held at them, and told them to leave, but they began pulling on the weapon, and because his finger was on both triggers, he testified, the weapon went off during the struggle, firing two shots simultaneously. He testified that one person was struck by the shotgun blasts. Then the men took the gun from Isaiah, and pointed it at Gonzalez and Isaiah, but the gun was out of ammunition. The men then began to leave and Isaiah left the apartment and ran in the opposite direction from them.

(6) Gonzalez testified on his own behalf. He testified that on the evening of the incident, he was walking home with three friends from a barbeque when he passed a group of men. He stated that the when he and his friends arrived at his apartment, they all stayed outside of his apartment while he smoked a cigarette. At that point, Juarez, Jr. approached and began to say "South 13 Surenos," the name of a gang, in Spanish and was displaying gang signs with his hands.[2] As the group of men approached Gonzalez, Gonzalez told the group that he was not gang affiliated. His friends left.

(7) Gonzalez testified that he was threatened and that he had heard the word

---

[2] *Id.* at 119.

4

"pistol" in Spanish.[3]  Gonzalez then retreated to his apartment.  He testified that Isaiah was the only one home and that they were able to hear a commotion coming from outside the apartment complex.  Gonzalez testified that he retrieved two shotguns from underneath the mattress of his back room.  He stated that he returned to the apartment door just as the group was entering the apartment complex.  He had one shotgun and Isaiah had possession of the other.  Gonzalez testified that he told Juarez, Jr., one of the men that entered the vestibule of his apartment, to leave the building.  He stated that the gun was pointed downward and that he and Juarez, Jr. began to struggle for the gun.  At that point, the gun discharged.  After the weapon was discharged, the struggle for the weapon continued.  He stated that his brother's weapon discharged after his weapon.  He then let go of the weapon in his hands to help his brother.  He testified that after his brother's weapon discharged twice, the group of men began to retreat.  Gonzalez retrieved both of the shotguns and then left the complex alone.  Gonzalez stated that his girlfriend then picked him up and dropped him off at 5th and Rodney.  In response to a question about why he used the shotgun, Gonzalez stated "I brought the shotguns out to more or less scare them away to get them to back off, my intentions were never to, for any of that to

---

[3] *Id.* at 121.

5

happen the way it did."[4]

(8)    When Gonzalez was arrested, he was in possession of a cell phone, which the police identified as being his. A photo of two shotguns was saved on Gonzalez's cell phone. Detectives also found numerous text messages on Gonzalez's cell phone discussing the shooting.

(9)    The State called a fingerprint expert. The expert was able to determine that the fingerprints lifted from a Winchester shots shell box found in the apartment belonged to Gonzalez. The expert noted on cross-examination that additional prints from a vitamin water bottle recovered at the scene matched Gonzalez as well.

(10)    During the trial, Gabriel Juarez-Diaz ("Juarez-Diaz") testified about the events of May 31, 2015. He testified that he went to the liquor store to purchase beer and then joined a group of men that included his son, Juarez, Jr., two nephews, and Felipe. The group decided to hang out outside of the Lancaster Court Apartments. He further stated that while they were at the apartments, a group of four men passed them. Juarez-Diaz testified that the men turned around, came back, and that is when the argument began. He stated that the group of unknown men began verbally arguing with his nephews and then the argument became physical. Juarez-Diaz testified that he attempted to separate the groups. He stated

---

[4] *Id.* at 127.

that during the altercation he was struck. Then, at some point after the fight outside, the other group of unknown males went into the apartment building and returned with guns. He stated that after the guns were brought out, his son and nephews attempted to take them away from the unknown males. He stated that during this struggle for the guns, one of the guns was fired and he was struck. He indicated that he was struck in the upper right shoulder and injured on his left ring finger. On cross-examination, Juarez-Diaz could not describe or remember who had shot him. Juarez-Diaz's injuries and the injuries of the other two victims were verified through the testimony of other witnesses.

(11) At the close of trial, the Court held a prayer conference during which the parties discussed the jury instructions. During this conference, there was no discussion of accomplice liability. During closings, defense counsel discussed Gonzalez's claim of self-defense. In addition, he argued that there was no intent to cause serious physical injury. Defense counsel stated, "It's a shot to the foot. He has the gun down, he's shooting down. Where is the intent there to cause serious physical injury to somebody?"[5] In regard to the conspiracy charges, defense counsel argued that the State failed to present evidence of an agreement between Gonzalez and Isaiah. Defense counsel further stated:

---

[5] *Id.* at 156.

7

In the law, you don't get, everyone's case is different, you don't get judged by the company that you keep, whether it's a stranger that's next to you or whether it's your own blood, okay, everybody's case is different because the facts for everybody's situation is different. And so just because Isaiah pled [sic] guilty, he was found guilty of one of these offenses, does not mean that Nathaniel is guilty for any of this.[6]

(12) After deliberations began, the jury submitted the following questions to the court: (1) "On the Assault in the First Degree, intentionally caused serious physical injury, does that mean he pulled the trigger or just conspired with another party to commit a crime?" and (2) "Can one be found guilty of assault in the first degree if they didn't pull the trigger?"[7] The trial court indicated to counsel the answer to both of the questions was "yes;" however the judge was concerned that the jury may take a simple "yes" as "direct[ing] them to an answer."[8] The judge decided that it was most appropriate to answer their question with an instruction on accomplice liability. Gonzalez's defense counsel objected on the basis that the jury was already instructed and that no additional instruction was necessary. The judge rejected this objection and delivered an accomplice liability instruction to the jury. After further deliberations, the jury found Gonzalez guilty of all charges. On June 24, 2016, the Superior Court sentenced Gonzalez to a total of 73 years at Level V,

---

[6] *Id.* at 158.

[7] *Id.* at 171-72.

[8] *Id.* at 172.

8

to be suspended after 19 years for six months of Level IV supervision, followed by one and a half years of lesser supervision.

(13) This Court reviews a trial judge's decision to provide supplemental instructions for abuse of discretion.[9] Here, the trial court did not abuse its discretion in deciding to provide a supplemental jury instruction on accomplice liability. Thus, for the following reasons, the decision of the Superior Court should be affirmed.

(14) Under Superior Court Criminal Rule 30, the trial judge must inform the parties of the proposed jury instructions before the closing arguments.[10] After the submission of the case to the jury, the court in its discretion may provide supplemental instructions based on a question submitted to the court by the jury during deliberations.[11]

(15) Gonzalez contends that the decision to provide a supplemental jury instruction on accomplice liability was prejudicial to his presentation of evidence and his closing argument, thus "effectively limit[ing] Gonzalez's Sixth Amendment Right to present and argue all legally available defenses."[12] Gonzalez relies largely

---

[9] *Wright v. State*, 953 A.2d 144, 148 (Del. 2008).

[10] "The court shall inform counsel of its proposed action upon the [requested jury instructions] prior to their argument to the jury." Super. Ct. Crim. R. 30.

[11] *Zimmerman v. State*, 565 A.2d 887, 890-91 (Del. 1989); *Sheeran v. State*, 526 A.2d 886, 893-94 (Del. 1987).

[12] App. to Appellant's Opening Br. at 20.

9

on the fact that the State never requested such an instruction despite an opportunity to do so and that the trial court judge never discussed such an instruction with the parties during the prayer conference. In fact, Gonzalez goes on to state that "[t]he defense did not request such an instruction and was proceeding upon reliance that there would be none."[13] In the closing, defense counsel relied upon the defense of justification, or self-defense. In addition, in his brief, Gonzalez submits that the defense strategy throughout the trial was to place the blame on Isaiah for the more serious injuries that were sustained during the altercation. Gonzalez further states that if he had been aware that an accomplice liability instruction would be given, a different trial strategy would have been utilized and he would not have chosen to present Isaiah as a witness. In addition, Gonzalez contends that his closing was prejudiced as well because counsel's argument largely discussed the relative culpability of Isaiah and Gonzalez.

(16) Gonzalez suffered no prejudice as a result of the instruction. First, the instruction was given in response to a jury question. Further, Gonzalez was charged with conspiracy, and the jury instructions included a conspiracy instruction. There is substantial overlap between a conspiracy instruction[14] and an accomplice liability

---

[13] *Id.* at 15.

[14] In pertinent part, the judge instructed the jury that in order to find Gonzalez guilty of Conspiracy in the Third Degree, they must find that the State proved beyond a reasonable doubt that:

10

instruction.[15] The only difference between the elements of accomplice liability and conspiracy is that the accomplice liability instruction adds the words "aids" and "counsels," in addition to the word "agrees."[16] The additional instruction did not materially alter the issues in the case and did not conflict with Gonzalez's justification defense.

(17) Gonzalez's counsel formed a strategy for the trial and pursued the idea of self-defense and the relative culpability of both Isaiah and Gonzalez throughout. In addition, these arguments and strategies were in place before the submission of instructions to the jury.

(18) There is no dispute that Isaiah and Gonzalez both used weapons on the day of the shooting. It was within the court's sound discretion to provide a supplemental jury instruction on accomplice liability given the facts of the case. It appears that the nature of the jury's question was such that an answer from the judge

---

Nathanial Gonzalez *agreed* with Isaiah Gonzalez that one or more of them would engage in conduct constituting Assault in the Third Degree or an attempt or solicitation to commit Assault in the Third Degree . . . or Nathaniel Gonzalez *agreed* to aid Isaiah Gonzalez in the planning or commission of Assault in the Third Degree or an attempt or solicitation to commit Assault in the Third Degree.

App. to Appellant's Opening Br. at 166 (emphasis added).
[15] In pertinent part, the judge instructed the jury that "a person is guilty of an offense committed by another person when: intending to promote or facilitate the commission of the offense, he *aids, counsels, or agrees* to aid the other person in planning or committing it." App. to Appellant's Opening Br. at 174 (emphasis added).
[16] *Id.*

11

must have necessarily touched upon the concept of accomplice liability. In fact, the trial court was hesitant to answer the jury's questions outright with an affirmative answer as he believed it would lead the jury to an "automatic negative for [Gonzalez]."[17]

(19) Gonzalez also argues that the trial court abused its discretion by providing the supplemental jury instruction on accomplice liability without including an instruction on individualized culpability. Gonzalez contends that by failing to provide the additional instruction on individualized culpability, he was deprived of his opportunity to present a complete defense.

(20) "This Court generally declines to review contentions neither raised nor properly presented to the trial court for decision."[18] The failure to object generally constitutes a waiver of that issue for purposes of appeal unless there is plain error.[19] Here, Gonzalez's counsel objected to the supplemental jury instruction because the State did not address accomplice liability when it had the opportunity and because accomplice liability "was not available to counsel during closings."[20] At that point, he did not request the additional instruction based on 11 *Del C.* § 274.[21] Thus, the

---

[17] *Id.* at 173.

[18] *Harris v. State*, 695 A.2d 34, 40 (Del. 1997).

[19] *Id.*

[20] App. to Appellant's Opening Br. at 172.

[21] "When, pursuant to § 271 of this title, 2 or more persons are criminally liable for an offense which is divided into degrees, each person is guilty of an offense of such degree as is compatible

omission of such an instruction is not a reversible error unless it constitutes plain error. Here, based on the defense and evidence presented at trial, the failure to provide an instruction based on § 274 does not constitute plain error. Based on Gonzalez's own testimony, he admitted to using a gun, admitted to his brother's involvement in the incident, and presented evidence in support of a justification defense. In finding him guilty of each charge of the indictment, the jury rejected the defense as a whole. There is no evidence of plain error.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is **AFFIRMED.**

BY THE COURT:

Justice

---

with that person's own culpable mental state and with that person's own accountability for an aggravating fact or circumstance." 11 *Del. C.* § 274.

13