STATE of Delaware,

v.

Vincent BARNETT.

I.D. No. 0305010007.

Superior Court of Delaware,
New Castle County.

Submitted: Aug. 19, 2004.
Decided: Jan. 14, 2005.
Amended: March 17, 2005.

Mark B. Chernev, Deputy Attorney General, Department of Justice, Wilmington, DE, for the State of Delaware.

Joseph W. Benson, Wilmington, DE, for the Defendant.

## AMENDED OPINION

JURDEN, J.

Before the Court is the Defendant's Motion for New Trial. For the reasons set forth below, the motion is **DENIED**.

### I. BACKGROUND

On July 14, 2003 Vincent Barnett (hereinafter the "Defendant") was indicted on two counts of Rape First Degree, three counts of Rape Second Degree, two counts of Rape Fourth Degree, and one count of Unlawful Sexual Contact Second Degree. Before the case went to the jury, the State entered a *nolle prosequi* on one of the counts of Rape Second Degree and the count of Unlawful Sexual Contact Second Degree. After a three day jury trial, the jury convicted the Defendant on two counts of Rape First Degree, one count of Rape Fourth Degree, and three counts of Unlawful Sexual Contact Second Degree.

The Defendant filed a timely Motion for New Trial on December 23, 2003, alleging juror bias. The Defendant alleges in his motion that Juror No. 9, Edith Cornish, (hereinafter "Cornish") was biased against him because she failed to advise the Court during *voir dire* that she knew the Defendant and in addition that her husband once

had an argument with the Defendant in 1989 or 1990 when they were coworkers.[1]

The State opposes the Defendant's Motion for New Trial, arguing that "there is nothing in the record to reflect the jury reached its verdict on anything other than the evidence presented at trial or that there was dishonesty during *voir dire.*"[2]

### A. *The Defendant's Specific Allegations of Juror Bias in his Motion for New Trial*

The Defendant alleges that after speaking with his family post-conviction, he realized he was actually "acquainted with Juror No. 9 Edith Cornish, which he had not realized at any point during trial."[3] In his Motion for New Trial, the Defendant asserts the following:

> From about 1987 through 1992 Mr. Barnett was employed by PennDel Salvage. He worked as a welder, and on occasion also operated the crane. There were approximately eight other individuals who performed the same job. From about 1988 through 1991 one of the other welders was the Reverend Anthony "Tony" Cornish. In the years that they worked together, Mr. Barnett and Rev. Cornish had lunch together three or four days a week, and Mr. Barnett occasionally attended Rev. Cornish's church. They also socialized at work functions. Mr. Barnett also knew Rev. Cornish's wife, Edith Cornish. Mrs. Cornish came

> to the job site on occasion to retrieve the family van from Mr. Cornish, and Mr. Barnett would speak with her in the parking lot. They also socialized at work functions, including Christmas parties . . .

In late 1989 or early 1990, Mr. Barnett's relationship with Rev. Cornish deteriorated when the two of them argued over Mr. Barnett's feeling that Rev. Cornish was not conducting himself properly as a minister. They also had a disagreement over the amount of a friendly wager of $25.00 on a football game, which Rev. Cornish believed was a wager for $50.00. When Mr. Barnett offered to pay the difference, Rev. Cornish told him not to worry about it, because some day he would get him back.

Following these incidents, Mr. Barnett and Rev. Cornish stopped speaking and going to lunches together. At the next employee Christmas Party, Rev. and Mrs. Cornish pointedly refused to sit at the same table as Mr. Barnett.

Since 1990, Mr. Barnett has had almost no interaction with either Rev. or Mrs. Cornish. When they have on occasion met in public, both Rev. and Mrs. Cornish have refused to speak to Mr. Barnett.[4]

In response to these allegations, and after conferring with counsel for the parties, the Court wrote to Cornish and requested that she appear at a hearing.[5]

---

1. *See* Motion for New Trial, Docket No. 32 at 2–3.

2. *See* State's April 30, 2004 Letter, Docket No. 65 at 1.

3. Docket No. 32 at 2.

4. *Id.* at 2–4.

5. Docket No 37. After conferring with the parties, the Court wrote to Cornish on January 27, 2004, stating:

As you may recall, you recently served on a jury in the trial of *State of Delaware v. Vincent W. Barnett.* It has been brought to the Court's attention that you may have known the defendant, Mr. Barnett, prior to the trial.

In light of this development, the Court requests that you appear at a hearing to address this issue. Because the Court will question you about answers you gave during the voir dire (jury selection) process, you may wish to retain an attorney to represent you at this hearing.

Upon receipt of the Court's Letter, Cornish called and advised the Court of her availability. After again conferring with counsel, the Court scheduled a hearing for February 10, 2004.

### B. *The February 10, 2004 Hearing (Cornish)*

At the February 10, 2004 hearing, the Court questioned Cornish as follows:

THE COURT: I wanted to ask you a couple of questions about the voir dire process. Do you remember serving as a juror in the Barnett trial?

THE JUROR: Yes, I do.

THE COURT: All right. And do you remember me asking a series of questions before I selected the jury?

THE JUROR: Yes.

THE COURT: And do you remember me asking whether or not you knew the defendant, his counsel, or the prosecutor or anyone in their offices?

THE JUROR: Yes.

THE COURT: All right. And I asked people to come forward who recognized the defendant, his attorney, the prosecutor, anyone from their offices. Do you recall that?

THE JUROR: Yes. I do.

THE COURT: All right. And you understood, at that time, that I was trying to find out whether or not any of the potential jurors in the case knew any one of the parties or their counsel?

THE JUROR: That's true.

THE COURT: All right. When the trial began, did you have any reason to think that any of the answers that you had given in the voir dire were no longer true?

THE JUROR: No.

THE COURT: Okay. All Right. During the course of the trial, at any point, did you become aware that you might have recognized the defendant or his counsel?

THE JUROR: No.

THE COURT: Information has been given to the Court to suggest that your husband—is your husband's name Tony?

THE JUROR: Anthony, yes.

THE COURT: Anthony.

THE JUROR: Yes.

THE COURT: And is he a reverend?

THE JUROR: Yes, he is.

THE COURT: Information has been supplied to the Court to suggest that you and your husband had social interaction with Mr. Barnett a number of years ago.

THE JUROR: I don't remember.

THE COURT: All right.

THE JUROR: Because my husband, I'm also co-pastor with him, so we have interaction with a lot of people, but I didn't remember him.

THE COURT: As you sit here today, do you recognize the defendant, Mr. Barnett.

THE JUROR: No, I still don't.

THE COURT: Okay. Were all the responses that you gave during the voir dire process true and correct to the best of your knowledge?

THE JUROR: Yes, Ma'am.[6]

At this point, the Court asked counsel to come to sidebar and asked whether they

Please contact my office upon receipt of this letter at (302) 255-0665 to arrange a mutually convenient time for the hearing. Thank you for your anticipated cooperation.

6. Docket No. 47 at pp. 8–11.

had any additional questions.[7] The State suggested that the Court conclude the questioning and stated, "I think she's been open and honest and we pretty much covered *voir dire* all throughout the trial and even today . . . ."[8] The Defendant, however, urged the court to continue its inquiry, stating:

> **DEFENSE COUNSEL:** Well, I'm concerned. A couple of things. Number one, its seems impossible to me, based on what I represented to your Honor about what was represented to me about the contact that she had that she not know the defendant and recognize him. I mean they had dinners together. He talked to her at the job site, according to what he says, 15 to 20 times during a period of a year.
>
> **THE COURT:** You said 30 before.
>
> **DEFENSE COUNSEL:** No, she had been there 30 times. I do have 30 to 40 times. If she does, in fact, live at Cavalier Townhouses, he was at her home. She was present. I mean it just seems to me we ought to look into this a little bit more at this point . . .[9]

After an extended discussion with counsel, the Court decided to question Cornish further and said to counsel at sidebar:

> **THE COURT:** My concern is, obviously, I want to make sure that the trial verdict was the result of a fair and unprejudiced and unbiased deliberation of the jury. My concern at this point is if we assume that the defendant is telling the truth and that he's had all this contact with her, then I, too, have questions about how someone could confess not to even recognize the name or the face given that amount of contact and the interaction with the husband. It trou-

bles me . . . . the problem is, as the trial judge, I need to make sure the process was fair and I don't have a comfort level right now, given the amount of information supplied in the defendant's motion for new trial, that she is telling the truth. That's all my point is. I need to be satisfied. So I'd like to conduct the inquiry further to make sure I'm satisfied, because the alternative is if I can't get a level of satisfaction, I, as the trial judge, have a new trial motion that I'd be inclined to grant.[10]

The Court then concluded the side bar conference and resumed questioning Cornish:

> **THE COURT:** Ms. Cornish, I just have a couple more questions. Thank you for your indulgence. I appreciate it. I'm sorry to drag you away from whatever it is you had to do today. Your husband, Anthony Cornish, was employed, I believe, at Penn–Del Salvage for some period of time. Do you recall that?
>
> **THE JUROR:** Yes. Yes.
>
> **THE COURT:** Do you know when he left their employ, roughly?
>
> **THE JUROR:** My goodness gracious.
>
> **THE COURT:** A number of years ago?
>
> **THE JUROR:** Yes.
>
> **THE COURT:** Okay. During that time, do you recall ever seeing Mr. Barnett at your husband's work site and speaking with him?
>
> **THE JUROR:** No.
>
> **THE COURT:** Okay. Do you recall ever having any social interaction in your home with the defendant at any point back then?
>
> **THE JUROR:** No.

---

7. *Id.* at 11.

8. *Id.*

9. Docket No. 47 at 12

10. *Id.*

**THE COURT:** Okay. For a time, did you live in Cavalier Townhouse?

**THE JUROR:** Yes, I did.

**THE COURT:** Okay. And the defendant was never in your home?

**THE JUROR:** Not that I'm—not to my knowledge. Not that I can remember.

**THE COURT:** Okay. Did you used to attend the Penn–Del Christmas parties? Do you ever recall attending those parties at your husband's work?

**THE JUROR:** One time.

**THE COURT:** Do you ever recall meeting the defendant at that party or talking to him?

**THE JUROR:** No, I don't remember. That was a long time ago.[11]

The Court again called counsel to sidebar. Once again, the State urged the Court to cease questioning. The Defendant asked the Court to pose two more questions which the Court agreed to do:

> **THE COURT:** Do you recall from time to time going to your husband's work site when he worked at Penn–Del Salvage to retrieve his brown truck, to go pick up his truck?
>
> **THE JUROR:** We didn't have a brown truck.
>
> **THE COURT:** Do you recall visiting him at the work site?
>
> **THE JUROR:** Oh, yeah, I've always visited my husband and would stop back and forth.
>
> **THE COURT:** Why would you go visit him at the work site?
>
> **THE JUROR:** To get money from him for the kids or pick him up or take to work, vice versa.

**THE COURT:** Did you ever go to his work site, get a ride to his work site, and pick up his vehicle and bring it home?

**THE JUROR:** I don't remember that. I really don't.

**THE COURT:** Okay. All right. You may step down. Thank you very much.[12]

Following the hearing, the Court requested written submissions from the parties.[13]

### C. *Letter from Juror No. 12 (Morris)*

Immediately before the February 10, 2004 hearing, the Court advised the parties that approximately two weeks earlier, a male juror had contacted the Court and told the trial judges' secretary that he was "very concerned about the way things 'came down' in the jury room . . . ."[14] The Court further advised the parties that it had instructed the secretary to tell the juror to "put it in writing" and have no further conversation with the juror. The trial judge's secretary memorialized her telephone conversation with the juror in a memo dated February 10, 2004.[15] Upon receipt of this memo, the Defendant proposed:

> [W]e wait two more weeks to see if . . . [this juror] responds to the Court in writing . . . concerning what took place in the jury room. However, if he does not respond in writing, I believe the Court should contact him and schedule an opportunity for him to come forward and express to your Honor, on the record, his concerns as to what transpired.[16]

---

11. *Id.* at 22–23.

12. *Id.* at 25–26.

13. *Id.* at 26.

14. Docket No. 47 at 2.

15. Docket No. 41.

16. Docket No. 43.

As of the February 10, 2004 hearing, the Court had not received any correspondence from this juror.[17] However, on February 20, 2004, the Court received a letter from, Juror No. 12, Bruce Morris (hereinafter "Morris"), who expressed concern about "whether . . . the jury system failed Mr. Barnett or more to the point if this particular jury was fair and impartial."[18] Specifically, Morris raised the following "concerns":

> During deliberations as we, the jury, was discussing all the witnesses believability and accuracy one of the jurors made the statement that the investigating detectives testimony shouldn't be questioned because as an officer in the child abuse division he was a guardian angel that was there to help the victims. This particular juror decided on a guilty verdict as soon as we sat down and felt there was no need to discuss anything further.

> One other juror stated that when she was talking to her husband the night before she stated that there was no way that she could find the defendant guilty because the state had not proven guilty beyond a reasonable doubt. She did vote guilty early on.[19]

Upon receipt of Morris' letter, the Court provided copies of it to counsel and asked counsel for their response. The Defendant requested "further inquiry by the Court to determine whether one of the jurors failed to truthfully answer questions during *voir dire*."[20] Consequently, the Court requested that Morris attend a hearing. That hearing occurred on April 19, 2004.

**D. *The April 19, 2004 Hearing (Morris)***

At the April 19, 2004 hearing the Court questioned Morris as follows:

**THE COURT:** I received your letter dated February 18, 2004, which followed a phone call to my chambers. And you had a discussion with my secretary, Debbie Wintjen.

**THE JUROR:** Yes.

**THE COURT:** Then the Court sent you a letter inviting you to come here today. And you had the option of retaining counsel since I was going to put questions to you.

**THE JUROR:** Yes.

**THE COURT:** Have you chosen to retain counsel?

**THE JUROR:** No.

**THE COURT:** I'm going to ask you a couple of very specific questions. and I'm going to ask you to just answer my questions. All right? There's certain parameters and rules applicable to this sort of proceeding post trial. And I don't want to run a foul of those, and neither do the lawyers.

**THE JUROR:** All Right.

**THE COURT:** Have you reviewed your letter recently?

**THE JUROR:** Yes.

**THE COURT:** In paragraph 1 of your letter, the first numbered paragraph, you indicate that there was a particular juror who made the statement that the investigating detective's testimony shouldn't be questioned because, as an officer in the child abuse division, he was a guardian angel that was there to help victims. Do you recall that?

**THE JUROR:** Yes.

---

17. *Id.*

18. Docket No. 45.

19. *Id.*

20. Docket No. 61, page 4. *See also* Docket No. 53.

THE COURT: Do you know which juror made that comment?

THE JUROR: Yes.

THE COURT: Who was it?

THE JUROR: Name I'm not sure, but it was the other alternate who therefore became a juror.

THE COURT: Right. Okay. When you indicate in your letter this particular juror decided on a guilty verdict as soon as we sat down and felt there was no need to discuss anything further, did you mean that that juror did not deliberate?

THE JUROR: Yes, that's what I mean. That statement was made—okay. That statement was made as soon as we walked in and barely had an opportunity to be seated. But that juror also did participate in conversations.

THE COURT: Afterwards.

THE JUROR: Afterwards, yes.

THE COURT: Okay. When you say when you just walked in, that's after I excused the jury to deliberate?

THE JUROR: Yes, yes.

THE COURT: With respect to paragraph 2 of your letter, you say, "one other juror stated that when she was talking to her husband the night before, she stated that there was no way that she could find the defendant guilty because the State had not proven guilty beyond a reasonable doubt. She did vote guilty early on." A couple specific questions about this. Do you know which juror you're referring to? Or can you describe her?

THE JUROR: I can describe her, yes.

THE COURT: All right.

THE JUROR: Tall, thin woman. Husband was an attorney—not an attorney—I'm sorry—pastor. Shoulder length grayish hair.

THE COURT: Black or white?

THE JUROR: White.

THE COURT: Was she African American or white?

THE JUROR: White

THE COURT: And her husband was a pastor?

THE JUROR: Yes.

THE COURT: Where did she sit in the jury box?

THE JUROR: You know what? I'm not sure.

THE COURT: When you mention that she was talking to her husband the night before, did you mean the night before the jury received the case to deliberate?

THE JUROR: Yes.

THE COURT: Then when she made that statement that she could not find the defendant guilty, there was no way she could find the defendant guilty, did she couple that with the information that her husband was a pastor?

THE JUROR: No, no. That was just one of the points I remember that I recall about her, trying to identify her. No, that did not become, in my opinion, an issue. She did not point that out. I just know that by general conversation.

THE COURT: Okay. When was that comment made by her about her husband saying that she talked to her husband and there was no way she could find the defendant guilty?

THE JUROR: At the beginning of the deliberations, during deliberations, but on the front end of them.

THE COURT: Did she convey any information from her husband about the case or about what the jury should or should not do?

THE JUROR: No.

THE COURT: So that was the limit of what she said about it?

THE JUROR: Yes

(Pause.)

**THE COURT:** Did any one else on the jury panel make any comments about discussions they had had with non-jurors about the case?

**THE JUROR:** I don't believe so. There may have been offhand comments about—no, I shouldn't say that. No. There really wasn't anything that stands out in my mind.[21]

The Court stopped its questioning at this point and asked counsel to approach sidebar. Following an extended discussion with counsel,[22] the Court continued questioning Morris:

**THE COURT:** Let me go back a moment to the juror that stated that when she was talking to her husband the night before, she stated that there was no way that she could find the defendant guilty because the State had no [sic] proven guilty beyond a reasonable doubt.

**JUROR NO. 12:** Yes.

**THE COURT:** Do you recall that?

**JUROR NO. 12:** Yes.

**THE COURT:** Do you recall exactly what she said?

**JUROR NO. 12:** That she—not exactly word for word. But paraphrasing, that the State didn't have enough evidence, that she couldn't find the defendant guilty because the State had not had enough evidence to prove his guilt.

**THE COURT:** Did you have an impression upon hearing this statement that that was her opinion or that was her opinion after talking with her husband?

**JUROR NO. 12:** That was her opinion.

**THE COURT:** Do you know whether she articulated that her husband felt differently than that?

**JUROR NO. 12:** No, I do not know that her husband—she did not indicate what her husband's opinion was.

**THE COURT:** She comes in and she says, I discussed this with my husband last night, and there is no way I could find this guy guilty?

**JUROR NO. 12:** Correct.

**THE COURT:** She didn't mention any dispute with the husband or he disagreed or he convinced me or anything like that?

**JUROR NO. 12:** No, that's not the case. She did not relay that sort of information.

**THE COURT:** So it was your impression hearing that statement that she just had a moral conviction that the evidence wasn't there, and she wasn't going to be able to convict?

**JUROR NO. 12:** Correct.

**THE COURT:** But then she did vote to convict.

**JUROR NO. 12:** Correct.

**THE COURT:** After she heard the discussion in the jury room.

**JUROR NO. 12:** Correct.

**THE COURT:** All right. Now I'm going to ask you to do me a favor and sit in the jury box where you were when I moved you. Okay?

**JUROR NO. 12:** Yes.

**THE COURT:** You were Juror No. 13 ... when Juror 12 failed to show up on December 10th, I moved you into the Juror 12 spot.

(Witness complies.)

**THE COURT:** The woman who made that comment that she spoke to her husband, do you recall whether she was seated in the first row or the second row?

---

**21.** Docket No. 59, 3–7.

**22.** Docket No. 59 at 8–12.

**JUROR NO. 12:** I believe she was in the second row. She was back here (indicating). And, actually, she may have been in that chair there (indicating), possibly.

**THE COURT:** That would be Kathleen [sic] Petrucci. Does that name ring a bell?

**JUROR NO. 12:** Yes, but . . .

I'm not 100 percent sure that that was her name.

**THE COURT:** You're pretty certain? Are you more than 50 percent certain that she was sitting in the back row?

**JUROR No. 12:** Yes. Yes. Because—

**THE COURT:** You're positive she was Caucasian? She was white?

**JUROR NO. 12:** Yes, yes.

**THE COURT:** Did you know where she worked or whether she worked outside the home?

**JUROR NO. 12:** I had the sense that she had a job outside the home, but I'm not sure what it was.

**THE COURT:** And what color was her hair again?

**JUROR NO. 12:** Sort of a grayish-blondish streak thing.

**THE COURT:** Did she wear glasses?

**JUROR NO. 12:** Reading glasses.

**THE COURT:** Was she thin?

**JUROR NO. 12:** Tall and thin, very tall and thin.

**THE COURT:** Was she taller than you?

**JUROR NO. 12:** Yes, yes.

**THE COURT:** How old would you guess she is? I know it's always dangerous to ask men that question, or women.

**JUROR NO. 12:** I believe, early forties. I believe she had a 14–year–old son, somewhere in that age bracket.

**THE COURT:** And did she happen to mention other than husband's a pastor, did she happen to mention what denomination or what church?

**JUROR NO. 12:** Not aware of that.

**THE COURT:** And you're sure that she's the one that said her husband was a pastor?

**JUROR NO. 12:** Yes.[23]

At the conclusion of the hearing, the Court conferred with counsel and decided to hold a hearing to question the juror who had allegedly discussed the case with her husband.[24]

### E. *The April 27, 2004 Hearing (Petrucci)*

At the April 27, 2004 hearing, the Court questioned Juror No. 8, Cathleen Petrucci ("Petrucci") as follows:

**THE COURT:** Some issues have arisen with regard to the jury in the Barnett trial. Do you remember serving on that jury panel?

**THE JUROR:** Yes.

**THE COURT:** Okay. It has been reported to the Court that a couple of things happened. I don't want to get into jury deliberations, that's not my point. And I don't want to get into your personal deliberations at all. Do you understand that?

**THE JUROR:** Yes.

**THE COURT:** Okay. The focus of my questioning is with regard to any conversations any member of the jury may have had outside the jury room with people not on the jury. Okay. So focusing on that, it's been reported that one of the members of the jury spoke with

---

**23.** Docket No. 59.

**24.** *Id.* at 18–24.

their husband about the case and told the jury that. And it came up that it might possibly be you. So I'm just checking with various jurors to have an understanding as to whether or not that happened. Can you elaborate and tell me whether I have the right juror or not?

THE JUROR: Well, it's not the right juror, because I didn't speak to my husband at all about the case. I took the instructions to heart, and I didn't say anything about it whatsoever.

THE COURT: Okay, did you have any discussions with anyone other than jury members and other than during deliberations?

THE JUROR: No, I didn't.

THE COURT: All right. So you adhered to the Court's admonition about not speaking about the case with anyone?

THE JUROR: Yes, I did.

THE COURT: All right. Were you present in the jury room when anyone reported having a conversation with their husband about the case?

THE JUROR: I don't recall that issue. I don't recall that coming up in the jury room that anyone had a conversation with their husband.

THE COURT: Do you recall anyone indicating before deliberations began that they had a conversation with their husband and/or that they could not possibly find the defendant guilty?

THE JUROR: Before it began?

THE COURT: Yes.

THE JUROR: Absolutely not, no. We didn't talk about the case even among ourselves until after the instructions were given. We just kept it to general

topics when we were waiting for the trial to end.

THE COURT: All right. And during the breaks before deliberations began where the jury would be back in the jury room, during the time that you were in the jury room with the jury, you never overheard any conversations that suggested to you that a member or members of the jury panel had discussed the case with a spouse, or a partner, or someone other than another jury member?

THE JUROR: Maybe one comment, but it seemed very innocuous, perhaps a comment that maybe—I couldn't even, I couldn't even tell you anything about it. Maybe someone spoke with their husband about the fact that it was a certain kind of trial, but I—it might have been another woman juror I'm thinking about. But I know she took the instructions to heart. And even between ourselves, we ate lunch together once, and we didn't talk about the case, we specifically said, well we can't talk abut the case, so we talked about our jobs and things.

THE COURT: And while you were in the jury room, that rule was adhered to by the members of the jury?

THE JUROR: I felt it was.

THE COURT: At any time before deliberations began or after deliberations started, did anyone make a comment that suggested to you that they had talked to someone outside the jury about the case, other than to tell them I'm sitting on this jury and this is the charge?

THE JUROR: No. I never heard anything like that, no.[25]

At the conclusion of this hearing, the Court requested supplemental briefing on

25. Docket No. 59 at 4–8.

the Defendant's Motion for New Trial. In his supplemental submission, the Defendant stated that he is "still concerned with the statement alleged by Juror Morris to have been made by an unknown juror regarding that juror's belief that the police officer was a 'guardian angel.'"[26] The Defendant argues that Delaware Rule of Evidence ("DRE") 606(b) "does not preclude an inquiry by the Court into this juror's failure to be truthful during *voir dire* and failure to follow the Court's instructions prior to deliberation."[27] In response, the State argues that a juror's statement during deliberations that an investigating officer should be believed because he is a "guardian angel," "falls squarely within the purview of DRE 606(b), and further inquiry is precluded by the rule."[28]

With respect to the issue of a juror speaking with her husband, the State argues:

> First there is nothing in the record to reflect what the juror was talking to her husband about, whether it was facts about the case, and to what, if any extent. It would be speculation to assume what it was about. Merely the allegation that a juror might have participated in or been exposed to a discussion concerning the case outside the courtroom raises the barest speculation that that juror reached her verdict on the basis of something other than the evidence presented at trial. Moreover, even assuming the record did reflect there was extensive discussions by the juror with her husband, and it was about the case, the

second element within 606(b) is not met, namely prejudice to the Defendant. Juror Morris clearly states in his letter that this juror stated after talking to her husband there was *no way she could find the Defendant guilty.* She said she could not *convict* the Defendant. Then, after returning to deliberations and openly discussing the evidence with other jurors, she changed her verdict to guilt. The allegation this juror may have participated in a discussion outside the courtroom raises slim speculation that she reached her verdict on the basis of something other than the evidence presented at trial.[29]

The State further points out that the "overwhelming amount of caselaw reflects that Delaware Law strongly disfavors a juror's impeachment of the verdict once the jury has been discharged."[30]

## II. *DISCUSSION*

### A. The Standard for a New Trial

Superior Court Criminal Rule 33 provides that the Court on motion of a defendant may grant a new trial to that defendant if "required in the interest of justice...." The Sixth Amendment to the United States Constitution and Article 1, § 7 of the Delaware Constitution guarantee a defendant in a criminal proceeding the right to a fair trial by an impartial jury.[31] A trial judge has broad discretion in determining whether to grant a new trial based on a post-trial allegation of

---

26. Docket No. 62.

27. Docket No. 62. Among other things, the Court instructed the jury that they should not give greater weight to the testimony of a police officer merely because he is a police officer.

28. Docket No. 64.

29. *Id.*

30. *Id.*

31. *See Banther v. State,* 783 A.2d 1287, 1289 (Del.2001).

juror bias.[32] The trial judge "occupies a unique advantage point in assessing a claim of juror misconduct and his determination will not be disturbed absent an abuse of discretion."[33]

Delaware law strongly disfavors a juror's impeachment of the verdict once the jury has been discharged. This standard has been codified by DRE 606(b) which provides in pertinent part:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that *a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror* ... [34]

Furthermore, according to the Delaware Supreme Court:

If a defendant can prove a reasonable probability of juror taint, due to egregious circumstances that are inherently prejudicial, it will give rise to a presumption of prejudice and achieves the proper balance between preserving the sanctity of the jury's deliberations, by

adherence to Rule 606(b)'s prohibition against inquiry into a juror's mental processes, and the defendant's right to a fair trial by an impartial jury.[35]

Thus, to warrant a new trial based on juror misconduct, the Defendant must show actual prejudice or that the circumstances surrounding the misconduct were so egregious and inherently prejudicial as to raise a presumption of prejudice.[36] This policy: i) discourages harassment of jurors by losing parties eager to have their verdict set aside; ii) encourages free and open discussion among jurors; iii) reduces incentives for jury tampering; iv) promotes verdict finality; and v) maintains the viability of the jury as a judicial decision-making body.[37] Similarly, to warrant a new trial based on inadvertent non-disclosure by a juror, the Defendant must demonstrate that the juror failed to answer honestly a material question on *voir dire*, and that a correct response would have provided a basis for a challenge for cause.[38] A juror's inaccurate response to a *voir dire* question based on a factual inaccuracy rather than dishonesty does not warrant a new trial.[39]

### B. *Juror No. 9, Cornish*

The Defendant conceded in his post-hearing submission that if the Court found Cornish truthful, "there would not

---

**32.** See *McDonald v. State*, 615 A.2d 531 (Del. 1992).

**33.** *Id.* quoting *Lovett v. State*, 516 A.2d 455, 475 (1986), *cert. denied*, 481 U.S. 1018, 107 S.Ct. 1898, 95 L.Ed.2d 504 (1987).

**34.** See Delaware Rule Evidence § 606(b) (emphasis added).

**35.** *Flonnory v. State*, 778 A.2d 1044,1054–55 (Del.2001) (internal citations omitted).

**36.** *Massey v. State*, 541 A.2d 1254, 1257 (Del. 1988); *Hughes v. State*, 490 A.2d 1034 (Del. 1985).

**37.** *Thompson v. Papastavros Assocs. Medical Imaging*, 729 A.2d 874, 878 (Del.Super.Ct.1998) (internal citations omitted).

**38.** *Smallwood v. State*, 813 A.2d 1141 (Del. 2002).

**39.** *Id.*

be any legitimate basis for a new trial."[40] The Court finds Cornish's testimony credible. The Court scrutinized her demeanor carefully as she responded to questions. The body language, facial expressions and tone accompanying her denials of any pretrial interaction with the Defendant convince the Court that she has no recollection of ever meeting or knowing him prior to trial. The fact that the *Defendant* did not recognize Juror No. 9 during *voir dire*, jury selection, or the entire four-day trial, is very significant to the Court and buttresses Cornish's credibility on this point. Assuming the Defendant's allegations are true about his relationship with Cornish and her husband, the Court finds Cornish has no recollection whatsoever of the Defendant. Forgetfulness does not indicate a lack of impartiality, nor does it indicate dishonesty. At best, Cornish's responses during *voir dire* were based upon a factual inaccuracy rather than dishonesty and as such do not warrant a new trial. Therefore, the Defendant is not entitled to a new trial on this ground.

### C. Juror No. 12, Morris

 Morris suggests in his February 18, 2004 letter that, *inter alia*, he was "swayed" by the "inadequate reasoning" of some of his fellow jurors. This statement cannot form the basis for a new trial. It is well established that "[p]ressures felt by one juror from other jurors are an inherent and intrinsic part of the deliberative process."[41] DRE 606(b) prohibits inquiry into the validity of the verdict based on an intrinsic part of the deliberative process.[42] This Court has consistently held that:

> During the course of jury deliberations there are numerous pressures which are brought to bear upon the jurors, particularly those who find themselves in a minority position. It is a natural part of jury deliberation that such pressures would exist, and multiply as the size of the minority diminishes. Those pressures the juror refers to are an inherent and intrinsic part of the deliberative process. One would expect that those in the majority would argue forcefully in an attempt to persuade those in the minority to accept the views of the majority. However, it has been generally held that jurors may not impeach their verdict by testimony that resulted from coercion or majority vote.[43]

Further, the Delaware Supreme Court held in *Sheeran v. State* that:

> The effect of the alleged actions of the other jurors upon the mind or emotions of the juror who wrote the trial court ... is precisely the kind of intra-jury influence that the prohibition of DRE 606(b) was designed to protect from inquiry. It is not open to consideration.[44]

A juror may not impeach his verdict by testimony that it resulted from coercion or majority vote.[45] The pressure that Morris felt "is inherent in the jury system."[46] Those pressures are not extraneous information or outside influence. They are an inherent and intrinsic part of the delibera-

---

40. Docket No. 43.

41. *Sheeran v. State*, 526 A.2d 886, 896 (Del. 1987); *State v. Matthews*, 1990 WL 91079 at *1 (Del.Super.Ct.1990).

42. *State v. Washington*, 2001 WL 1480870 (Del.Super.Ct.2001) at *2, *3.

43. *State v. McGriff*, 2000 WL 1211139 at *3 (Del.Super.) (citations omitted).

44. *Sheeran v. State*, 526 A.2d 886, 897 (Del. 1987).

45. *See id.* at 896–97.

46. *Id.* at 896.

tive process.[47] Morris' post-trial claim that he was "swayed" by the "inadequate reasoning" of other jurors does not warrant a new trial. Morris also alleged that another juror said an investigating detective's testimony should not be questioned because he was a "guardian angel" there to help victims. The Court ruled from the bench that this comment related to juror deliberations and therefore any additional inquiry about it was precluded by DRE 606(b). The juror's alleged expression of biases or prejudicial views within the deliberative process falls squarely within the purview of DRE 606(b).[48] There is insufficient evidence in the record to support the Defendant's argument that the juror who purportedly made this comment lied during *voir dire.* Consequently, the Defendant is not entitled to a new trial on this ground.

### D. Juror No. 8, Petrucci

Morris contends that one of the jurors, allegedly Petrucci, told the jury during deliberations that she had talked with her husband and stated "there was no way she could find the defendant guilty because the state had not proven guilt beyond a reasonable doubt." [49]

■■■■■■ A communication between a juror and a third party relevant to the case to be decided constitutes "extrinsic" influence that justifies inquiry into the validity of the verdict.[50] The Court conducted a thorough inquiry of Morris and Petrucci post-trial in an effort to determine the exact nature of the extrinsic influence and whether there was actual or presumed prejudice to the Defendant.[51] First, the

Court found Petrucci very credible and is therefore not convinced that she made such a comment. The State points out that:

> Juror Petrucci testified she did not speak to her husband or anyone about the case and she took the instructions to heart. Neither her, nor any other juror spoke to any third parties about the facts of the case. All the jurors "took the instructions to heart," and "the rule was adhered to." All jurors deliberated, and had an opportunity to speak on more than one occasion. Nothing in her testimony gives the slightest bit of evidence that there was any extraneous influence on the jury. She testified credibly, and in witnessing her demeanor, it was apparent she was both surprised and offended by the fact her integrity as a juror was being questioned.[52]

The Court is satisfied after its inquiry that even if Petrucci did make such a statement it does not warrant a new trial. There is no prejudice to the Defendant because Petrucci allegedly said she told her husband she *could not find* the Defendant guilty and the State had *not* met its burden. Moreover, Morris admitted he heard this statement in "general conversation," and it was not an issue "pushed by the juror."

The Court is satisfied that no extrinsic information or influence was injected into the jury deliberations by Petrucci or any other juror and thus a new trial is not warranted on this ground.

---

47. *Id.*

48. *Thompson v. Papastavros,* 729 A.2d 874, 877 (Del.Super.Ct.1998).

49. Docket No. 45.

50. *See Sheeran v. State,* 526 A.2d 886 (Del. 1987); *McCane v. State,* 734 A.2d 159 (Del. 1999).

51. Docket Nos. 59 and 61.

52. Docket No. 65.

### III. *CONCLUSION*

The sheer number of jurors implicated post-trial by the Defendant's motion and other jurors caused this Court great concern about the jury verdict. The Court does not take allegations of juror bias or extrinsic influence upon a jury lightly. Given the gravity of the allegations and the Defendant's constitutional right to a fair trial by an impartial jury,[53] the Court conducted a series of hearings to determine whether there was juror bias, or exposure to prejudicial information or outside influence. Notwithstanding the results of this post-trial inquiry, the Court still has concerns about the verdict because of the Defendant's adverse pre-trial relations with juror Cornish's husband (which had the Court been aware of before trial would have prompted the Court to excuse Cornish for cause), and the issues raised in Morris' letter. Unfortunately, the relevant case law prevents this Court from granting a new trial on these grounds. Because the Court finds no actual prejudice and the circumstances, while troubling and unusual, are not so egregious and inherently prejudicial as to create presumptive prejudice, the Court reluctantly denies the new trial motion.

Accordingly, the Defendant's Motion for New Trial is DENIED.

IT IS SO ORDERED.

---

53. *See* U.S. Const. amend. VI; DE Const. art. I, § 7.